FILED
2012 Apr-16  PM 02:58
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MAXINE H. RUDOLPH,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:11-cv-0027-AKK** |
| **THE BOARD OF TRUSTEES** | ) | |
| **OF THE UNIVERSITY OF** | ) | |
| **ALABAMA,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Before the court is the Board of Trustees of the University of Alabama's ("Defendant") motion for summary judgment in the above styled action, doc. 13, which is due to be **GRANTED** for the reasons stated more fully below.

## I.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

This action arises from Maxine H. Rudolph's ("Rudolph") former employment with Defendant.  *See generally* doc. 3.  Defendant originally hired Rudolph, an African American female, in September 1982, and beginning in 1999, employed Rudolph as an Administrative Associate for the Department of Cell Biology with the University of Alabama at Birmingham ("UAB").  Doc. 14-1, at 48; doc. 20-4, at 1.  Defendant generally describes the function of an Administrative Associate as follows:

> Under minimal supervision, provides essential administrative and business support services within a school, department or unit to include budget maintenance, personnel processing, policy communication, facilities/space management, database/files management and/or office management.  Coordinates programmatic activities and functions.  Conducts special projects relating to an office's administrative operations at the direction of superior. Maintains vendor relationships.  Interfaces with internal and external constituencies.  May provide confidential secretarial/office support functions for department chairs, large division directors, deans or other organization executives.  Typically supervises clerical/secretarial staff.  May assist in preparation and submission of grants.  May be responsible for equipment/furniture repair.  May assist with grants and contracts administration.  May prepare financial reports and analyses.

Doc. 20-3, at 14.  More specifically, Rudolph's position as an Administrative Associate for the Department of Cell Biology included "organizer/liaison for the Cell Biology Seminar Program.  This involves planning and organizing the weekly events, as well as coordinating the speakers and attendees . . . . [O]rganizer/liaison for Departmental faculty retreats and other special departmental functions such as

Developmental Biology Day . . . [and] administrative and secretarial support for four faculty members, housed on the 6th floor of the McCallum building." Doc. 14-1, at 52; *id.* at 9-11.

On July 21, 2008, the Department of Cell Biology held a staff meeting, and, although not on the meeting's official agenda, the Department raised the issue of possible position eliminations. Doc. 14-1, at 5; doc. 20-4, at 5. Approximately ten months later, on June 1, 2009, Defendant eliminated Rudolph's Administrative Associate position due to "severe budget constraints and the lack of departmental state funding." Doc. 14-1, at 48. In conjunction with eliminating Rudolph's position, Dr. Etty Benveniste ("Dr. Benveniste"), the Department of Cell Biology's chairman, attested to a Statement of Rationale for Position Elimination ("Position Elimination Statement"),which, as it relates to Rudolph's organizing functions for the Cell Biology Seminar Program, provided that:

> Historically, we have invited two external speakers and two internal speakers (per month) and this has created a substantial workload (travel reimbursements, honorariums, arranging hotels/airfare, planning itineraries, and submitting numerous internal UAB processes such as personal services forms and new vendor requests). However, this program has been reduced drastically in response to budget cuts and proration and so the associated workload has diminished. As an example, we now have just one outside speaker so this particular aspect has been cut by 50%. In addition to the cut in external speaker involvement, the number of internal speakers has also been reduced substantially.

*Id.* at 58. Morever, regarding Rudolph's functions as organizer of faculty retreats and other special departmental events, the Position Elimination Statement

established that "[h]istorically, our Department has held at least one of these events each year but we have scaled back these occasions, in response to severe budget cuts and proration.  At the current time, we plan to host a faculty retreat every three years and we do not have any plans for other future departmental events."  *Id.*  Finally, for Rudolph's secretarial and administrative support duties, the Position Elimination Statement maintained:

> Of these [four] faculty members, only three utilize this position on a regular basis.  Furthermore, most faulty members have become more self-sufficient in recent years and therefore do not fully utilize supporting positions such as this one.  This is due to the fact that many functions, such as grant submissions and regulatory compliance submissions, have moved to online systems.  Many of these new systems are username and password driven, so the faculty must submit the forms themselves.  In addition, due to the departmental IT infrastructure, all faculty members have their own protected "space" on our departmental server, so they keep up with their own records, documents, historical data, etc.

*Id.*  Indeed, the Position Elimination Statement concluded that Rudolph's position retains "certain inherent qualities which make it a satisfactory reduction, including a) the position does not have any regulatory/compliance responsibilities, b) the position is funded entirely from state funds, and c) the position generates zero revenue for the University or the Department."  *Id.* at 58-59.  As such, "[t]he department will save an annual amount of $77,418.27, in the form of salary and fringe benefits.  In addition, due to this reduction/reallocation of duties, the Department will operate with increased efficiency and reduced redundancy among the other staff members."  *Id.* at 59.

Rudolph disputes the Department's justifications for her position's elimination, specifically asserting that the Department hired more than one outside speaker per month, doc. 14-1, at 9-10, that the Department held a Biology Day in 2009 and a faculty retreat in September 2009, *id.* at 10-11, and that all four faculty members utilized Rudolph's administrative services, *id.* at 12.  In support, Rudolph submits budget reports for the Cell Biology Seminar that demonstrate a consistent budget from June 2008 until April 2009.  *See* doc. 20-2, at 30-38.  Rudolph also provides a May 4, 2009 email, sent to the Cell Biology Department, regarding the 2009 Cell Biology Departmental Retreat to take place September 19-20, 2009.  Doc. 20-3, at 1.  Finally, Rudolph submits an October 7, 2008 email from Cheryl C. Lyles ("Lyles"), an Administrative Manager for the Department of Cell Biology, stating that there is "no overtime during proration."  Doc. 20-3, at 5.  However, Rudolph submits a subsequent April 14, 2009 email from Lyles providing that "[w]e can not approve overtime for <u>another</u> administrative employee as it relates to this event.  All overtime must be **pre-approved**!  Therefore, we are only prepared to submit 1 request for 1 administrative overtime payment for the Cell Biology Retreat.  Additional overtime staffing can not be approved at this time."  *Id.* at 3 (emphasis in original).

Additionally, Rudolph contends that, at the time of her termination, Defendant retained similarly situated white female employees "that could have been eliminated."  Doc. 14-1, at 15.  Specifically, Rudolph lists Renee Eubank, a Program Coordinator II, Debbie Sewell, an Administrative Supervisor, and Jane

Mason, a Project Manager.  *Id.* at 16.  However, Dr. Benveniste testified that thirty percent of Renee Eubank's salary consisted of grant funds, and that she "made significantly less money than" Rudolph.  *Id.* at 56.  Additionally, Dr. Benveniste stated that Debbie Sewell performed "effort reporting, HIPAA [Health Insurance Portability and Accountability Act] compliance and other compliance and training functions." *Id.* at 57.  Indeed, Rudolph admits that her position had no responsibilities for HIPAA compliance or annual compliance training.  *Id.* at 12-13.  Similarly, Dr. Benveniste testified that Jane Mason "had a completely different job than [Rudolph because] Mason's job responsibilities included overseeing renovations, labs and equipment, calling movers and posting notices regarding equipment." *Id.* at 57.  *See also id.* at 16.

After Rudolph's termination, she received twelve weeks of severance pay. *Id.* at 6.  *See also id.* at 50 (UAB's Severance Pay and Benefits Policy for Non-Faculty Employees).  Rudolph also applied for other positions with UAB, doc. 20-2, at 1-25, doc. 14-1, at 7; however, Rudolph's efforts proved unsuccessful.  *Id.* Accordingly, Rudolph began drawing retirement from the Retirement Systems of Alabama in September 2009.  Doc. 14-1, at 7, 23.  Although Rudolph receives retirement payments, she contends that, by eliminating her position, Defendant prevented Rudolph's eligibility and participation in the State's Deferred Retirement Option Plan ("DROP").  This Plan purportedly allows an employee "to work an additional 3-5 years while accumulating matching funds to be distributed at retirement."  Doc. 19, at 2.

Rudolph filed an Equal Employment Opportunity Commission ("EEOC")
Charge of Discrimination against Defendant on July 20, 2009, alleging retaliation,
race discrimination, and age discrimination.  Doc. 1, at 9.  The EEOC issued
Rudolph a Right to Sue Notice on October 7, 2010, *id.* at 10, and Rudolph timely
filed this action on January 4, 2011.  Rudolph, proceeding *pro se*, filed an
Amended Complaint on February 4, 2011, alleging *only* race discrimination under
Title VII.  Doc. 3, at 4.  *See also* doc. 14-1, at 4.  Defendant now moves for
summary judgment against Rudolph's Amended Complaint.  Doc. 13.  The motion
is fully briefed, *see* docs. 19, 22, and ripe for review.

### III.   ANALYSIS

Rudolph contends that her termination was racially motivated, and
therefore, Defendant violated Title VII.  *See* doc. 3, at 4; doc. 19, at 7.  Title VII
"makes it unlawful for an employer to 'discriminate against any individual with
respect to his compensation, terms, conditions, or privileges of employment,
because of such individual's race.'"  *Brown v. Ala. Dep't Transp.*, 597 F.3d 1160,
1174 (11th Cir. 2010) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Implicit in a claim for
race discrimination is the contention that racial animus factored in the adverse
employment action at issue, and "a plaintiff may use three different kinds of
evidence of discriminatory intent: direct evidence, circumstantial evidence or
statistical evidence.  The analytical framework and burden of production varies
depending on the method of proof chosen."  *Standard v. A.B.E.L. Servs., Inc.*, 161
F.3d 1318, 1330 (11th Cir. 1998).

Where, as here, a plaintiff relies on circumstantial evidence to show discriminatory intent, *see* doc. 14-1, at 6; doc. 19, at 6-10, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[1] Under the *McDonnell Douglas* framework, the plaintiff must first create an inference of discrimination by establishing a *prima facie* case of discrimination. *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citation omitted). If the plaintiff satisfies her initial burden, "then the defendant must show a legitimate, non-discriminatory reason for its employment action." *Id*. (citation omitted). "If it does so, then the plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination." *Id*. (citation omitted). In other words, assuming the plaintiff establishes a *prima facie* case, and the defendant provides a legitimate, non-discriminatory reason for the adverse employment action, to show pretext, the plaintiff must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons

---

[1] Rudolph provides in her brief opposing summary judgment that she "did not hear direct statements of bias against her on her race but has experienced, and have[sic] knowledge of differential treatment throughout her employment at the University of Alabama at Birmingham." Doc. 19, at 3. Indeed, at deposition, counsel for Defendant asked Rudolph "within the year before your position was eliminated, did you ever hear anyone make a statement to you indicating that they were biased against you based on your race," and Rudolph answered in the negative. Doc. 14-1, at 6. Later in the deposition, Rudolph refers to purported "negative statements" made by co-employees about her; however, Rudolph never alleges that these "negative statements" referred to her race and admits that the co-employees probably made these statements three or four years before her termination. *Id.* at 19-21. Accordingly, the court finds no evidence of direct discrimination.

were not what actually motivated its conduct.'"  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).  "The district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Id.* (quotation marks and citations omitted).  However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007) (citation omitted).

Here, Defendant argues that summary judgment is appropriate because Rudolph fails to sufficiently demonstrate a *prima facie* case of discrimination. Furthermore, Defendant maintains that, even if Rudolph satisfies her initial burden, she fails to establish that the non-discriminatory reasons for Rudolph's termination constitute pretext.  Doc. 14, at 8-12.  The court will address each contention in turn.

A.    *Prima Facie* Case

"To establish a *prima facie* case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more

favorably than she was treated; and (4) she was qualified to do the job." *Burke-Fowler*, 447 F.3d at 1323.  Defendant concedes that Rudolph satisfies the first, second, and fourth *prima facie* elements, but asserts that "Plaintiff cannot identify a similarly situated employee of a different race who was treated more favorably than she."  Doc. 14, at 8.  More specifically, Defendant contends that Rudolph's named comparators—Renee Eubank, Debbie Sewell, and Jane Mason—are not, in fact, "similarly situated."  *Id.* at 9.

The Eleventh Circuit instructs that "[t]he plaintiff and the employee she identifies as a comparator must be similarly situated 'in all relevant respects.'" *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (quoting *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1060 (11th Cir. 1994)).  Indeed, the "comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer."  *Id.*  By eliminating Rudolph's position and retaining the comparators' positions, Defendant certainly treated Rudolph less favorably than the comparators—however, the court must ascertain whether Rudolph is actually comparing "apples to apples."  *See Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999).  Based on Rudolph and her comparators' respective employment responsibilities and burdens on the Department's finances, the court finds that Rudolph fails to meet her burden of establishing that the comparators are "similarly situated in all relevant respects." *Cf. Beaver v. Rayonier, Inc.*, 200 F.3d 723, 727-28 (11th Cir. 1999).

        i.    *Renee Eubank*

Rudolph first asserts that Renee Eubank is a similarly situated comparator. *See* doc. 14-1, at 16.  Eubank served as a "Program Coordinator II" for UAB, not an Administrative Associate.  *Id.*  However, employment titles are not necessarily dispositive for a "comparator" analysis.  *See, e.g.*, *Walton v. Cowin Equip. Co., Inc.*, 774 F. Supp. 1343, 1347-48 (N.D. Ala. 1991).  Accordingly, Eubank's employment responsibilities serve as another important consideration.  Generally, a Program Coordinator II for UAB:

> Under minimal supervision, coordinates administrative, personnel and logistical support for a defined department program(s), often of a large and/or complex nature.  Carries out established program objectives and directives.  Follows established guidelines or protocols.  Determines the best approach to accomplish assignments. May participate in program planning and in setting program objectives.  May supervise support staff.  May act as a communication liaison and special events planner.  Interfaces with outside resources such as volunteers, alumni, patients, other professionals in a defined field or with continuing education students. May be responsible for adherence to program budget and/or other fiscal duties.  May assist with grant and contract preparation and submission.  May handle data management.

Doc. 20-3, at 15.  For purposes of summary judgment, the general job description of Eubank's position and Rudolph's position are arguably similar.  *See id.* at 14. However, Dr. Benveniste, the chairman of the Cell Biology Department, testified that Eubank's salary was 30% grant-funded, and she earned "significantly less money" than Rudolph.  Doc. 14-1, at 56.  Moreover, the Department funded Rudolph's position entirely by state funds, as opposed to grant funds.  *Id.* at 58.

These undisputed facts demonstrated that Eubank is not "similarly situated in all relevant respects."  Defendant contends that it eliminated Rudolph's position "due to severe budget constraints and the lack of departmental state funding."  *Id.* at 55. Thus, the fact that Eubank earned a smaller salary, 30% of which grant money funded, makes her an unsuitable comparator.  The court cannot infer circumstantial evidence of racial discrimination based on Defendant's decision to retain Eubank instead of Rudolph because choosing to do the opposite—terminate Eubank and retain Rudolph—would impose a substantially greater financial burden on the Cell Biology Department.  *See* doc. 14-1, at 56.  In other words, using Eubank as a comparator second guesses a reasonable financial business decision made by Defendant.

        ii.   *Debbie Sewell*

Rudolph also fails to demonstrate that Debbie Sewell is a satisfactory comparator because Sewell, unlike Rudolph, performed regulatory and compliance functions for the Cell Biology Department.  Dr. Benveniste testified that, as an Administrative Supervisor, Sewell "had responsibility for effort reporting, HIPAA compliance and other compliance and training functions."  *Id.* at 57.  Rudolph admits that her position entailed no responsibility for HIPAA compliance or annual compliance training.  *Id.* at 13.  Moreover, Defendant's Position Elimination Statement provides a section labeled "[e]limination satisfies criterion given by UAB Leadership," which states, "[t]his position possesses certain inherent qualities which make it a satisfactory reduction, including a) the position

does not have any regulatory/compliance responsibilities . . . ."  *Id.* at 58.  For circumstantial evidence of discrimination, a plaintiff is not required to establish that a comparator's job responsibilities were identical; however, there is a "substantiality" requirement.  And indeed, Sewell's regulatory and compliance job functions render her position materially different than Rudolph's position.  *Cf. Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 592-93 (11th Cir. 1994) (discussing comparators in Equal Pay Act context, and asserting that "the standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high").  Due to the different job functions performed by Sewell, especially those functions pertaining to regulatory compliance within the Department, Rudolph cannot satisfy her initial burden that Sewell is "similarly situated in all relevant respects."  *See, e.g.*, *Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137 (7th Cir. 1998) (in age discrimination context, court found comparator not similarly situated because she, unlike plaintiff, possessed "extensive experience in inputting information into the PMF/BOM"—a computer manufacturing program).

       *iii.*   *Jane Mason*

Finally, Jane Mason performed completely different job duties than Rudolph.  Dr. Benveniste provided that "Mason's job responsibilities included overseeing renovations, labs and equipment, calling movers and posting notices regarding equipment," doc. 14-1, at 57, and Rudolph admits that her position included none of these responsibilities, *id.* at 16.  Again, the comparator employee must perform substantially similar job functions.  Here, Rudolph fails to establish

that she performed *any* of the same duties as Mason.  Furthermore, Rudolph argues that she "could have performed some of Jane Mason's duties of overseeing renovations, calling movers, posting notices and sending out e-mails before and after her rehire to the Department.  Some of her job responsibilities would not have been [] difficult for Plaintiff to acquire if trained for and given the opportunity."  Doc. 19, at 6.  While this may be true, Rudolph's argument misses the mark.  A plaintiff cannot raise an inference of discrimination merely by claiming that she *could* have performed the job functions of a completely different employment position held by a person outside of plaintiff's protected class.  When an employer reduces its workforce for economic reasons, an inference of racial discrimination requires the plaintiff and comparator to have held similar positions because only then can the court infer an *improper* motive for choosing to eliminate plaintiff's position.  Otherwise, the court is forced to second guess an employer's business decision to eliminate a position with job functions that differ significantly from a position with other job functions.

Put simply, the *prima facie* case "serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's" termination.  *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1151 (11th Cir. 2005).  Here, by providing dissimilar comparators, Rudolph fails to eliminate the obvious nondiscriminatory reasons for her discharge.

    B.    Pretext

    Alternatively, even if the court assumes that Rudolph meets her initial

burden under *McDonnell Douglas*, she fails to demonstrate that Defendant's non-discriminatory justifications for eliminating her position were merely pretext to mask racial discrimination.  Defendant asserts that it eliminated Rudolph's position because of budget constraints and a lack of departmental state funding, and indeed, Rudolph's position was entirely state-funded and generated no revenue for the University or Department.  Doc. 14-1, at 48, 58-59.  Moreover, as it relates to Rudolph's specific job functions, Defendant contends that budget cuts reduced her workload as the organizer/liaison for the Cell Biology Seminar and for special departmental functions such as faculty retreats.  *Id.* at 58.  Finally, Defendant provides that Rudolph's secretarial and administrative support workload decreased because faculty members utilized this position less.  *Id.*  Thus, Defendant concluded that the Department "will save an annual amount of $77,418.27, in the form of salary and fringe benefits.  In addition, due to this reduction/reallocation of duties, the Department will operate with increased efficiency and reduced redundancy among the other staff members."  *Id.* at 59.

These reasons satisfy Defendant's burden because Defendant "need only produce evidence that could allow a rational fact finder to conclude that [Rudolph's] discharge was not made for a discriminatory reason."  *Standard*, 161 F.3d at 1331.  Defendant's detailed explanation in its Position Elimination Statement, doc. 14-1, at 58-59, certainly allows for such a conclusion by a rational fact finder.  *See Standard*, 161 F.3d at 1331.  Assuming Rudolph satisfied her initial burden—which she failed to do—Defendant sufficiently "rebutted the

presumption of discriminatory intent.  In light of this, [Rudolph] must now create a genuine issue of material fact as to whether the reasons advanced are pretextual. In other words, [Rudolph] must provide sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for [her] discharge." *Id.* at 1332.

To demonstrate pretext, Rudolph first offers UAB's budget reports for the Cell Biology Seminar ending in April 2009.  *See* doc. 20-2, at 30-38.  At best, these reports reveal that the Cell Biology Seminar maintained a consistent budget from June 2008 until April 2009.  However, Defendant eliminated Rudolph's position on June 1, 2009, *see* doc. 14-1, at 48; accordingly these prior budget reports offer insufficient evidence to demonstrate pretext.  Without evidence pertaining to the Cell Biology Seminar's financial situation or budget *at the time of the discharge* or even perhaps shortly thereafter, Rudolph fails to provide such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *See Combs*, 106 F.3d at 1538 (citations omitted).  Defendant maintains that, in June 2009, it eliminated Rudolph's position due to, in part, budget restrictions in the Cell Biology Seminar—an April 2009 budget report insufficiently casts doubt on this justification.

Rudolph also maintains that, despite its assertion of budget restrictions, the Cell Biology Department went on a departmental retreat in September 2009.  *See*

doc. 20-3, at 1.  In support, Rudolph offers a May 4, 2009 email she sent to the Cell Biology Department reminding the participants about logistical arrangements for the September retreat.  *Id.*  Assuming the September 2009 retreat actually occurred, this is still insufficient evidence of pretext.  Defendant's Position Elimination Statement provides that, as opposed to holding a faculty retreat every year, "we plan to host a faculty retreat every three years and we do not have any plans for other future departmental events.  As such these reductions create much less work for this particular position."  Doc. 14-1, at 58.  Accordingly, even though the Department held a retreat in 2009, Rudolph presents no evidence that the Department held, or plans to hold, retreats annually—rather than once every three years.  Indeed, hosting a faculty retreat in September 2009, an event planned since at least April 2009, *see* doc. 20-3, at 1, lends no support to an inference that Defendant actually discharged Rudolph for racially motivated reasons.

Moreover, Rudolph argues that the four faculty members she assisted consistently utilized her administrative and support services; therefore, Rudolph claims Defendant's assertion—that faculty members "have become more self-sufficient in recent years and therefore do not fully utilize supporting positions such as this one," *see* doc. 14-1, at 58—constitutes pretext.  Doc. 19, at 4 (citing doc. 14-1, at 11-12, 14).  However, Rudolph admits that many administrative functions, such as grant and compliance submissions, have moved online, and that faculty members submit these forms themselves.  Doc. 14-1, at 12.  Rudolph also provides that the four faculty members she supported generally did not utilize her

assistance every day.  *Id.* at 14.  Rudolph's testimony concerning her administrative services for faculty members fails to cast sufficient, if any, doubt on Defendant's proffered non-discriminatory justification that the need for these support services decreased prior to Rudolph's termination.  *Cf.  Brown v. Am. Honda Motor Co., Inc.*, 939 F.2d 946, 954 (11th Cir. 1991) ("Although the plaintiff has produced scattered pieces of circumstantial evidence, none of it, even taken as a whole, raises sufficient questions to undermine [defendant's] nondiscriminatory rationale.").

Finally, Rudolph contends that "[a]lthough it was stated to me 'no overtime during proration' [t]here were promotions, raises and overtime given during proration and budget cuts."  Doc. 19, at 5.[2]  Rudolph offers an October 7, 2008 email from the Department's Administrative Manager that there is "no overtime during proration" and a subsequent April 14, 2009 email from the same employee that "all overtime must be pre-approved."  Doc. 20-3, at 3-5.  The court refuses to speculate about Defendant's overtime payment policy change between October 2008 and April 2009; however, assuming such change occurred, it offers no evidence of pretext regarding the non-discriminatory justifications for terminating Rudolph's position.  Put simply, Defendant paying some overtime wages in April

---

[2] As it relates to Defendant's policies, Rudolph also alleges that "[t]he University policy regarding hiring of the position was violated."  Doc. 19, at 3.  However, in support of this assertion, Rudolph submits the University's 1997 "Promotions and Transfers" policy and a 2002 EEOC Charge of Discrimination that Rudolph filed against the University.  Doc. 20-4, at 15-19.  While the court is unaware of the disposition of this 2002 EEOC Charge, Rudolph may not relitigate these grievances against Defendant here.

2009 fails to raise the reasonable inference that Defendant discharged Rudolph for discriminatory, rather than financial, reasons.

## IV.   CONCLUSION

Absent any inference or indication of a racially charged motive arising from Rudolph's termination, the court must dismiss her claim.  The court's responsibility is not to second guess the Defendant's reasons for a business judgment, but instead to determine if the "reasons given were merely a cover for a discriminatory intent."  *See Brown*, 939 F.2d at 951.  Here, the court finds insufficient evidence of Defendant's purported discriminatory intent to survive summary judgment.  The court will enter a separate order dismissing this case, consistent with this opinion.

**DONE** the 16th day of April, 2012.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE